**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JASON HAMEL,** | * | |
| **Petitioner,** | * | |
| **v.** | * | **Civ. No. DLB-19-3280** |
| **WARDEN, et al.,** | * | |
| **Respondents.** | * | |

**MEMORANDUM OPINION**

Self-represented petitioner Jason Hamel filed a timely petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of his state court convictions.  ECF 1 & 3. The respondents filed an answer to the petition asking the Court to deny it as meritless.  ECF 19. The Court ordered the respondents to provide supplemental records.  ECF 22.  The respondents provided the records in their possession.  ECF 23.  Hamel subsequently provided additional, sealed transcripts.  ECF 25.[1]  No hearing is necessary.  *See* Rule 8(a), *Rules Governing § 2254 Cases in the U.S. Dist. Cts.*; 28 U.S.C. § 2254(e)(2).  For the following reasons, Hamel's petition is denied. A certificate of appealability shall not issue.

**I.      Background**

On the evening of June 20, 2008, Kevya Bluitt was shot and killed in the 800 block of Battery Avenue in Baltimore, Maryland.  ECF 19-1, at 22.  The case went "cold" until police received a tip that led to Hamel's arrest.  *Id.* at 33.  On April 23, 2012, Hamel was indicted for first degree murder and related firearm offenses.  *Id.* at 4.  From January 30 through February 6, 2013, Hamel was tried by a jury sitting in the Circuit Court for Baltimore City.  ECF 23-2 – 23-8.

---

[1] Hamel's motion to seal the additional transcripts, ECF 24, is granted.

During the State's opening statement, the prosecutor mentioned Hamel's wife, Amber Hamel, in explaining why the case took so long to get to trial:

> [Prosecutor:] Now, you might be thinking to yourself, June of 2008, that's a really long time ago. Why are we just selected now? Well, back in June of 2008 or thereabouts, sometime in October perhaps, detectives had run down every lead that they could possibly find with respect to this case. It became what the detectives will refer to as a cold case. There was nothing else they could do to investigate it. [No one] else came forward until April of 2011. Detective Corey Alston of the Baltimore City Police Department[,] who happened to be the same investigator who was at the scene in June of 2008[,] received information that someone wanted to talk to him and so he made arrangements to bring that person to speak with him and *based on information that that person*[,] *who you'll later find out who is Amber Hamel*—
>
> [Defense counsel:] Objection, Your Honor.
>
> THE COURT: Overruled.
>
> [Prosecutor:] Based on information provided to him, he conducted a further investigation and you'll hear from the witnesses he spoke with based on that investigation.

ECF 23-4, at 63 (emphasis added). During a bench conference at the end of the opening statement, defense counsel objected to the State's reference to Amber Hamel, a witness with marital privilege, and the implication that Hamel's wife identified him and caused the case to be reopened. *Id.* at 65–68. Defense counsel requested a mistrial. *Id.* The court denied the request (subject to renewal). *Id.* at 68. The State later conceded that Detective Alston could not mention Mrs. Hamel. ECF 23-6, at 39–40.

The State produced ten witnesses during its case-in-chief. *See* ECF 19-1, at 22. First, Officer Scott Lawrence provided a general description of the crime scene on June 20, 2008. *See* ECF 23-4, at 76–78. Dr. Jack Titus, the Chief Medical Examiner who performed Bluitt's autopsy, testified that the cause of death was a gunshot wound to the chest and the manner of death was a homicide. *Id.* at 121. Dr. Titus testified that a single bullet entered Bluitt's chest, hit his pulmonary

artery, then continued seven inches upward and to the right before exiting his body and entering his right arm. *Id.* at 113. He also testified that the lack of evidence of soot or stippling on Bluitt suggested that the gun was more than 18 to 24 inches away when he was shot. *Id.* at 122.

Four bystanders took the stand. Joyce Setmeyer testified that while sitting on a porch on the corner of Battery Avenue and Montgomery Street, she saw a young, Caucasian man pace by Federal Hill Park, interact with a man in a small blue car, then get in the car. *Id.* at 132, 135. She later saw the car move, heard a firecracker sound, and then saw the man who had been pacing run past her. *Id.* at 140–42. She described him as having a medium build and short black hair and clarified that she believed he was a "very light skinned" African American man. *Id.* at 145–46.

Another bystander, Stacy Winters, testified that she was driving down Battery Avenue and had to pass a dark, double-parked, four-door car. ECF 25-3, at 73. As she did so, she saw a man come from the park, shoot into the passenger side, and leave. *Id.* at 74. She described him as "a white man, . . . a big, strong guy . . . . Somewhere around 6 feet. He wasn't overweight. He was like a muscular guy" who wore jean shorts and had brown hair. *Id.* at 74–75.

A third bystander, Eva Stone, testified that she was walking her dog on the corner of Churchill and Battery when she heard a loud noise, saw a man standing near a dark blue, four-door car, and heard him say, "Get him out of the car." *Id.* at 87–88. After she saw the car drive away, she walked over to a man lying in the road and performed chest compressions. *Id.* at 88.

Finally, Michael Brassert testified that he saw a double-parked car on Battery Avenue, which he described as a two-door car with a hatchback. *Id.* at 182, 195. He saw a man walk from the park toward the car and then lean into the passenger side. *Id.* at 200. He heard a loud noise and then saw the man run past him with his left hand stationary at his side. *Id.* at 183–84, 186. He described the man as tall and slim with short, dark hair and wearing a short-sleeved shirt and shorts.

*Id.* at 185.  Three years later, he identified Hamel from a photo array as the man he had seen that night.  *Id.* at 189.

Homicide Detective Alston took the stand and testified that he obtained still photographs from a security camera the night of the shooting that showed "the blurred image of what appears to be a Caucasian male right in the middle of Montgomery Street" as well as a dark-colored sedan trying to leave the area on Churchill Street.  ECF 23-6, at 69.  He testified that the case went cold until he received new information that led him to interview three of Hamel's acquaintances.  *Id.* at 56–57.  Detective Alston did not mention Amber Hamel during his testimony.  *See id.*

Three of Hamel's acquaintances also testified.  Darryl Robinson testified that he, Bluitt, and another man named Jason Johnson set up a drug deal with Hamel.  ECF 23-5, at 14–15.  The men intended to sell Hamel 4.5 ounces of cocaine in exchange for $5,000 but decided to rob Hamel instead.  *Id.*  Robinson testified that he was in the car with Bluitt at the time of the shooting, saw Hamel outside of the car, and heard a gunshot, but did not see or know who fired the weapon.  *Id.* at 21, 35.  However, he testified that on September 23, 2011, he was interviewed by Detective Alston and identified Hamel through a photo array: "The person I see in the photo was the shooter and my friend's killer . . . . The guy who did the shooting name is Jason."  *Id.* at 29–30.  On re-direct examination, the State played a video recording of Robinson's statement to police from that day.  *Id.* at 66.  On that video recording, and contrary to Robinson's testimony, he stated that he saw Hamel "point[] the gun, and he shot one time."  *Id.* at 66.  On cross-examination, Robinson again stated that he did not see Hamel shoot the gun.  *Id.* at 69.

David Bennett testified that he dropped Hamel off at Federal Hill Park on the evening of June 20, 2008.  *Id.* at 104.  He later saw Hamel walk out of the park towards a dark-colored car and pull out a handgun from his waistband.  *Id.* at 107.  He heard a gunshot.  *Id.*  Bennett testified

that later, while he was at the police station waiting to speak with Detective Alston, Hamel called

him and threatened to hurt him if he shared any information.  *Id.* at 110.  After his interview,

Bennett went to Hamel's home with Crystal Staggs, where Hamel again threatened Bennett.  *Id.*

at 114.  Bennett testified that when he was interviewed again in 2011, he identified Hamel from a

photo array, stating: "The person in the pictures I selected is Jason Hamel.  I seen Jason Hamel

jump down off the wall of Federal Hill Park and proceed to pull out a handgun from his waistband

and proceed towards the green vehicle."  *Id.* at 123.

Crystal Staggs, Bennett's girlfriend, also testified about the evening of the shooting.  She

stated that she saw Hamel after Bennett got home and Hamel apologized to her but did not indicate

what he was apologizing for.  ECF 23-6, at 16.  Bennett told Staggs that it was a "drug deal gone

bad, that I guess they were trying to do a deal, and something went wrong."  *Id.* at 18.  Staggs

stated that she spoke to the police a year before trial, identified Hamel in a photo array as someone

she knew, and wrote, "The man in the photo is Jason.  Jason was with David Bennett on the night

of the shooting.  On the night of the shooting, Jason kept apologizing to me for what had

happened."  *Id.* at 21, 24.  She also identified Hamel on the record, indicating that he looked the

same on the date of trial as in 2008.  *Id.* at 27.  Staggs described Hamel as tall, while describing

Bennett as chunkier and short with lighter skin.  *Id.* at 28.  Staggs stated that the two men were

"opposites every way around."  *Id.*

On February 6, 2013, the jury returned guilty verdicts on second degree murder and the

related firearm offenses.  ECF 23-8, at 6–7.  On March 19, the court sentenced Hamel to a total of

fifty years' imprisonment.  ECF 23-9, at 18.

Hamel timely appealed to the Court of Special Appeals, which affirmed his conviction on

November 14, 2014.  ECF 19-1, at 57.  On December 15, Hamel sought certiorari review in the

Court of Appeals. *Id.* at 9.  The petition was denied on February 23, 2015.  *Id.* at 58; *Hamel v. State*, 109 A.3d 666 (Md. 2015).[2]

Hamel filed a *pro se* petition for state post-conviction relief on August 3, 2015.  ECF 19-1, at 59–62.  The petition was amended by counsel on December 1, 2016.  ECF 19-2, at 3–20.  The amended petition alleged that trial counsel rendered ineffective assistance by failing to properly advise Hamel regarding his right to testify; failing to call defense witnesses; failing to seek a trajectory expert; failing to take corrective action after a juror saw Hamel in full restraints; and failing to file a timely motion for modification of sentence.  *See id.*  Hamel filed a motion to withdraw his petition, which was granted on June 23, 2017.  ECF 19-1, at 13.  He refiled his petition on December 14.  *Id.* at 14.  A hearing took place on March 13, 2019.  ECF 23-10.  Hamel and his trial counsel, Jane McGough, testified.  *See id.*  On March 15, the court issued an order on Hamel's post-conviction petition granting his request to file a belated motion for modification but denying the petition in all other respects.  ECF 19-1, at 17.  Hamel filed an application for leave to appeal with the Court of Special Appeals on April 1.  ECF 19-3, at 3–24.  The Court of Special Appeals denied his application on October 24.[3]

Hamel filed a petition for writ of habeas corpus in this Court on November 14, 2019.  ECF 1 & 3.  The respondents concede his petition is timely.  ECF 19, at 14 n.2.  He asserts three grounds of trial court error and six grounds of ineffective assistance of counsel.  Specifically, he claims it was error for the trial court to (1) deny his motion for a mistrial over the prosecutor's improper comment during the opening statement; (2) admit into evidence witness Daryl Robinson's

---

[2] For cases decided when the Supreme Court of Maryland and the Appellate Court of Maryland had different names, the Court will utilize the earlier citation format.

[3] The respondents fail to provide the Court with a copy of the referenced order but indicate that October 24, 2019 is the date that leave was denied.  ECF 19, at 14.

recorded police statement; and (3) refuse to instruct the jury on involuntary manslaughter based on hot blooded response to legally adequate provocation.  He claims his trial counsel was ineffective because (1) she failed to properly advise him on the right to testify; (2) her improper advice on testifying undermined his ability to assert an involuntary manslaughter defense; (3) she failed to call certain witnesses; (4) she failed to hire a trajectory expert; (5) she failed to pursue the issue when a juror saw Hamel in full restraints; and (6) she was ineffective when the state argued facts not in evidence during closing argument.  He previously asserted each of his claims in either his direct appeal or his post-conviction petition.

## II.   Standard of Review

For habeas petitioners in custody pursuant to the judgment of a state court, relief is available "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see also Wilson v. Corcoran*, 562 U.S. 1 (2010); *Barnes v. Joyner*, 751 F.3d 229, 238 (4th Cir. 2014).

With extremely limited exceptions, state prisoners must first raise their federal claims in the state courts before seeking federal habeas review.  *Shinn v. Ramirez*, --- U.S. ----, 142 S. Ct. 1718, 1731–32 (2022).  The habeas statute requires state prisoners to exhaust the remedies available in the state courts as a prerequisite to federal relief.  28 U.S.C. § 2254(b)(1)(A).  When a state prisoner has not raised a claim in the state courts and state procedural rules would require dismissal of the claim, the claim technically is exhausted, but it is deemed "procedurally defaulted."  *Ramirez*, 142 S. Ct. at 1732.  The Court "may only review procedurally defaulted claims to determine whether the petitioner has shown that he falls within an exception" that permits review of the claim's merits.  *Richardson v. Kornegay*, 3 F.4th 687, 695 (4th Cir. 2021).  The two

recognized exceptions require the petitioner to demonstrate "cause and prejudice, or actual innocence." *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010).

When a state court has ruled on the merits of a petitioner's federal claim, this Court's review is highly deferential. "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions." *Larry v. Branker*, 552 F.3d 356, 368 (4th Cir. 2009). Pursuant to § 2254(d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "a petitioner is entitled to relief only if the state court adjudication of their claim was [1] 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court'; or [2] 'based on an unreasonable determination of the facts in light of the evidence presented.'" *Allen v. Stephan*, 42 F.4th 223, 246 (4th Cir. 2022) (quoting 28 U.S.C. § 2254(d)). "The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review of factual findings and to substitute its own opinions for the determinations made on the scene by the trial judge." *Davis v. Ayala*, 576 U.S. 257, 276 (2015) (internal quotation marks and citations omitted).

"[C]learly established Federal law" for purposes of § 2254(d)(1) includes only "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 365 (2000)). "A state court's decision is 'contrary to' clearly established federal law under § 2254(d)(1) when it 'arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or 'decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Allen*, 42 F.4th at 246 (quoting *Williams*, 529 U.S. at 412–13). A state court's decision is an "unreasonable application" of clearly established federal law if the state court correctly identified the governing legal principle but "'unreasonably applie[d] that principle to the facts of the prisoner's case.'" *Id.*

(quoting *Williams*, 529 U.S. at 413).  This standard is meant to be "difficult to meet."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  "'[T]he ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice.'"  *Allen*, 42 F.4th at 246 (quoting *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (per curiam)).  The petitioner "must show that the state court's ruling was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* (quoting *LeBlanc*, 137 S. Ct. at 1728).

A state court's factual determinations, meanwhile, "are presumed correct, and the petitioner must rebut this presumption by clear and convincing evidence."  *Id.* (citing 28 U.S.C. § 2254(e)(1)).  A state court's decision is based on an "unreasonable determination of the facts in light of the evidence presented" under § 2254(d)(2) when it is "'sufficiently against the weight of the evidence that it is objectively unreasonable.'"  *Id.* (quoting *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010)).  "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'"  *Wood v. Allen*, 558 U.S. 290, 301 (2010) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)).  "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part."  *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010).  This is "especially so" when the state court "resolved issues like witness credibility," and credibility judgments may be overturned only when the error is "'stark and clear.'"  *Id.* (quoting *Cagle v. Branker*, 520 F.3d 320, 324–25 (4th Cir. 2008)).

Even if a petitioner meets his burden under § 2254(d) and establishes the state court erred, "habeas relief will not be granted unless the error had substantial and injurious effect or influence

in determining the jury's verdict" or there is at least "grave doubt as to the harmlessness" of the error.  *Allen*, 42 F.4th at 246–47 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), and *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002)) (internal quotation marks omitted).  In short, AEDPA requires this Court to uphold the judgment of a state court except in extremely rare cases.

## III.   Analysis

### A.  Trial court error claims

Hamel's first three claims assert that the trial court erred.  The Court addresses each claim in turn.

#### 1.  Ground One

In ground one, Hamel contends that trial court erred by denying his motion for a mistrial based on the prosecutor's mention, during opening statement, of his wife Amber Hamel, who was not slated to testify at trial because of marital privilege.  *See* ECF 23-4, at 63.  After the prosecutor's opening statement, the defense moved for a mistrial, which the court denied, stating that "it's been only a mention in the opening statements without any reference beyond that . . . . [O]nce the evidence develops, the potential prejudice of the statement may be diminished."  *Id.* at 65–68.  When Detective Alston later testified, he did not mention Hamel's wife.

Habeas corpus relief is available for prosecutorial misconduct only when the prosecutor's conduct is so egregious in the context of the entire trial that it renders the trial fundamentally unfair.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted) (assessing whether prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process" and holding that the "undoubtedly" improper comments did not do so).  To reverse a conviction based on prosecutorial misconduct, "the defendant must show (1) 'that the prosecutor's remarks or conduct were improper' and (2) 'that such remarks or conduct

prejudicially affected his substantial rights so as to deprive him of a fair trial.'"   *United States v. Caro*, 597 F.3d 608, 624–35 (4th Cir. 2010) (citation omitted) (finding prosecutor's "troubling" closing argument did not warrant reversal).

Hamel raised this issue on direct appeal.  ECF 19-1, at 32–42.  The Court of Special Appeals determined that the prosecutor's reference to Amber Hamel was "improper but not severe."  *Id.* at 36.  The court concluded that while the information Amber Hamel provided to police was "plainly inadmissible" because of marital privilege, the isolated remark "did not pervade the entire trial."  *Id.* at 37.

Hamel fails to establish that this conclusion is contrary to or an unreasonable application of federal law on prosecutorial misconduct.  The remark was improper: it implied that the information Amber Hamel provided to police led them to arrest Hamel, yet the prosecutor knew that Mrs. Hamel would not be testifying because of marital privilege.  But this was the only mention of Hamel's wife throughout the trial.  Later in the trial, before Detective Alston testified, the State conceded that he could not mention Mrs. Hamel during his testimony.  ECF 23-6, at 39–40.  The trial judge instructed the prosecutor that "because it's important that I think any possible prejudice from the mention in opening be minimized, I think even the mention of new information [that Detective Alston received] needs to be very brief."  *Id.* at 40.  Detective Alston did not mention Mrs. Hamel, testifying only that he received new information in 2011 that reopened the investigation.  *Id.* at 56–57.  Hamel has not shown that the isolated mention of Mrs. Hamel during opening statement so affected his substantial rights as to deprive him of a fair trial.  The Court of Special Appeal's conclusion that the trial court's refusal to grant a mistrial based on this single

remark did not deprive Hamel of a fair trial is not contrary to, nor an unreasonable application of, federal law on prosecutorial misconduct.

Hamel's first claim is without merit.

### 2. Ground Two

In ground two, Hamel contends that the trial court erred by admitting into evidence Daryl Robinson's recorded statement to police under Md. Rule 5-802.1(a) & (e).  He further argues that the statement could not have been admitted under the hearsay exception recognized in *Nance v. State*, 629 A.2d 633 (Md. 1993), because the trial court did not make a preliminary determination that Robinson was a "bona fide turncoat witness."  ECF 3, at 10.

During Robinson's trial testimony, he said he did not recall seeing Hamel with a gun on the night of the shooting.  ECF 23-5, at 53, 54.  He also said he did not see Hamel shoot the victim. ECF 23-5, at 12, 13, 35, 67, 69.  During a recorded conversation with Detective Alston on September 23, 2011, however, he stated that on the night of the shooting, he saw Hamel with a gun and saw Hamel shoot the victim.  *Id.* at 66, 68.  When the prosecutor showed him another statement that he had made on November 22, 2011 and asked if that refreshed his recollection, he replied,

> I can't recall.  Like this was years ago.  Like it's not like I'm on trial for—so it's not like I'm trying to remember all these things because it's not like—it's not benefitting me or nothing.  I'm trying to recall as best as I can.  I really don't care. That's what I'm trying to say.  There you go.  That's the best way to describe it.

*Id.* at 54. Due to Robinson's contradictory testimony, the prosecution moved to play a portion of his September 23, 2011 recorded statement to police to the jury and admit it into evidence.  *Id.* at 55–60.  The defense objected on hearsay grounds, reasoning that Robinson "answered to the best of his ability" at trial and had not recanted any earlier statements such that a hearsay exception would be warranted.  *Id.* at 57.  The State replied that Robinson had recanted his earlier statement

and that, pursuant to *Nance*, a hearsay exception applied and the tape should be admitted as substantive evidence. *Id*. In *Nance*, the Maryland high court permitted the admission of a prior inconsistent statement by a "turncoat witness" as substantive evidence where the witness displayed "selective" loss of memory and was available for cross examination. 629 A.2d at 553–56. The trial court noted that "I'm not sure he has—it has to be a recanting under *Nance* . . . . And I don't think that a recanting—certainly that's one circumstance in which it can be admitted. I don't think it's necessary that he be recanting." *Id.* at 58–59. Instead of relying on *Nance*, the court permitted the introduction of the statement as substantive evidence under Maryland Rule of Evidence 5-802.1 as a prior, recorded, inconsistent statement. *Id.*; Md. R. Evid. 5-802.1(a). The prosecution played a portion of the tape recording, in which Robinson stated that Hamel pointed the gun, and he "shot one time . . . . [A]fter I seen that shot, I . . . ducked down . . . ." *Id.* at 66. After listening to the recording and verifying that it was his own voice on the tape, Robinson testified again that he did not see Hamel shoot the victim. *Id.* at 67.

Hamel raised this claim in his direct appeal. ECF 19-1, at 42–51. The Court of Special Appeals noted that prior inconsistent statements are not excluded by Maryland's general hearsay rule. *Id.* at 50. It concluded that the trial court did not err because Robinson's taped statements satisfied the initial requirements of Md. Rule 5-802.1—they were prior statements of Robinson, who testified at trial and was subject to cross examination, and they were contemporaneously recorded in substantially verbatim fashion—and they directly contradicted his trial testimony. *Id.* at 51. It reasoned that, because Robinson's trial testimony directly contradicted his prior statements, *Nance* was inapplicable and there was no reason for the trial court to evaluate Robinson's claim of forgetfulness. *Id.*

In considering a habeas petition's challenge to a state evidentiary ruling, this Court does not "review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding." *Barbe v. McBride*, 521 F.3d 443, 452 (4th Cir. 2008) (internal citation and quotation omitted); *see also Estelle*, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").  A federal question is presented "only in circumstances impugning fundamental fairness or infringing specific constitutional protections." *Barbe*, 521 F.3d at 452 (internal citation and quotation marks omitted).

Hamel has not established that the Court of Special Appeals' finding that the statement was appropriately admitted as substantive evidence is contrary to or an unreasonable application of clearly established federal law.  Both the trial and appellate courts properly applied Maryland's evidentiary rules—Robinson's prior statements were inconsistent with his trial testimony and otherwise compliant with Md. Rule 5-802.1.  Even if the courts' rulings were incorrect, Hamel has not established that the error was "so extreme as to result in a denial of a constitutionally fair proceeding." *Barbe*, 521 F.3d at 452.

Hamel's second claim is without merit.

### 3.  Ground Three

In ground three, Hamel contends the trial court erred in refusing to instruct the jury on voluntary manslaughter based on hot blooded response to legally adequate provocation.  The pattern jury instruction that Hamel requested, 417.4, states:

> Killing in hot blooded response to legally adequate provocation is a mitigating circumstance. In order for this mitigating circumstance to exist in this case, the following five factors must be present:

(1) the defendant reacted to something in a hot blooded rage, that is, the defendant actually became enraged;

(2) the rage was caused by something the law recognizes as legally adequate provocation, that is, something that would cause a reasonable person to become enraged enough to kill or inflict serious bodily harm.  The only act that you can find to be adequate provocation under the evidence in this case is [a battery by the victim upon the defendant] [a fight between the victim and the defendant] [an unlawful warrantless arrest of the defendant by the victim, which the defendant knew or reasonably knew to be unlawful];

(3) the defendant was still enraged when [he][she] killed the victim, that is, the defendant's rage had not cooled at the time of the killing;

(4) there was not enough time between the provocation and the killing for a reasonable person's rage to cool; and

(5) the victim was the person who provoked the rage.

MPJI-Cr 4:17.4(C) (brackets in original).

The State objected to the instruction first on the grounds that there was no legally adequate provocation because the evidence showed that there was no robbery.  ECF 23-6, at 101.  The trial court noted, however, that "there is evidence in one version, namely Mr. Robinson's that would say that Mr. Johnson, I think it was, walked over to the car, pointed a gun at Mr. Hamel and robbed him."  *Id.* at 101–02.  The State then argued several other grounds for objection, including that even if there was evidence of a robbery, there was not sufficient provocation because there was time between the robbery and the shooting.  *Id.* at 104.  The defense countered that the instruction was warranted because there was evidence (from Robinson) that Hamel was robbed of thousands of dollars, possibly at gunpoint.  *See id.* at 102, 105.  The trial judge ultimately refused to give the instruction, reasoning,

with respect to the hot-blood provocation issues, 417.4, I believe . . . that it fails in the Defense theory both because there's no evidence of any provocation other than the robbery [of Hamel] at worst involving pointing the gun and that in the absence of an actual battery, that would be a legally insufficient provocation, and second,

15

that there's no evidence that Mr. Hamel was excited to a level of anger and rage, still under the influence of the rage when he committed—allegedly committed the shooting.  And therefore, I don't think this is a hot-blood situation under 417.4.

*Id.* at 107–08.

Hamel raised this claim on direct appeal.  ECF 19-1, at 51–75.  The Court of Special Appeals cited to the special jury instruction for voluntary manslaughter based on hot blooded response to legally adequate provocation and noted that the binding Maryland precedent required the same factors as the instruction, albeit in slightly different terms.  *Id.* at 54 (citing *Christian v. State*, 951 A.2d 832, 842 (Md. 2008)).  It reasoned that Hamel needed to show "some evidence" of all five factors.  *Id.* at 55.  Because there was no evidence of his subjective state of mind—that he was actually enraged—he was not entitled to the instruction.  *Id.* at 55–56 (citing *Wilson v. State*, 7 A.3d 197, 205 (Md. Ct. Spec. App. 2010) (holding that the trial court correctly rejected request for "hot blooded response" instruction), *vacated on other grounds*, 30 A.3d 955 (Md. 2011)).  The court noted that Hamel chose not to testify at trial.  *Id*. at 56.

Hamel has not established that the Court of Special Appeals' conclusion is contrary to or an unreasonable application of federal law.  A defendant is "not entitled to have a jury instructed as to lesser degrees of the crime simply because the crime charged is murder."  *Briley v. Bass*, 742 F.2d 155, 164 (4th Cir. 1984).  Where there is no evidentiary support for an instruction as to lesser degrees of a crime, the instruction is not required.  *Id.* at 165.  Instead, "due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction."  *Hopper v. Evans*, 456 U.S. 605, 611 (1982).  For the evidence to warrant an instruction on the provocation defense under Maryland law, Hamel's subjective rage needed to "affirmatively be established."  *Wilson*, 7 A.3d at 205.  It is insufficient that his rage could be deduced from Robinson's testimony about the botched drug deal or robbery.  *See id.*  This Court's

independent review of the trial transcript confirms that no evidence of Hamel's subjective state of mind at the time of the shooting was introduced at trial.  Without evidence that Hamel "reacted to something in a hot blooded rage," he could not establish the first element of the hot blooded response instruction.  MPJI-Cr 4:17.4(C)(1).  Indeed, Hamel does not dispute the Court of Special Appeals' conclusion that no such evidence was introduced.  *See* ECF 3, at 12–13.[4]

Hamel's third claim is without merit.

## B.  Ineffective assistance of counsel claims

Hamel's remaining claims assert that he received ineffective assistance of counsel in violation of the Sixth Amendment.  To help ensure our adversarial system produces just results, the Sixth Amendment to the Constitution guarantees a criminal defendant the effective assistance of counsel.  *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017) (citing *Strickland v. Washington*, 466 U.S. 668, 686 (1984)); *see also Buck v. Davis*, 137 S. Ct. 759, 775 (2017).  To prevail on a claim of ineffective assistance of counsel, a petitioner must satisfy the familiar two-pronged test set forth in *Strickland*, 466 U.S. at 687–88.  *See United States v. Freeman*, 24 F.4th 320, 326 (4th Cir. 2022).  That test requires the petitioner to show that (1) his counsel's performance was deficient and (2) he was prejudiced by the deficient performance.  *Strickland*, 466 U.S. at 687; *Freeman*, 24 F.4th at 326.  Ultimately, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686.

---

[4] Hamel argues that his counsel rendered ineffective assistance by failing to properly advise him about his right to testify in his own defense, thereby taking away the option of pursuing a defense of voluntary manslaughter based on hot blooded response to legally adequate provocation.  As discussed in this Court's analysis of ground five, that claim is without merit.

To satisfy the deficient performance prong, a petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness." *Id.* at 688. Performance is evaluated based on "'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690); *see Carthorne*, 878 F.3d at 465. The "first prong sets a high bar." *Buck*, 137 S. Ct. at 775. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. On collateral review in particular, "judicial scrutiny of counsel's performance must be highly deferential." *Carthorne*, 878 F.3d at 465 (quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000)). It generally is sufficient for Sixth Amendment purposes "when counsel provides reasonably effective assistance, including demonstrating legal competence, doing relevant research, and raising important issues." *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 691. Conversely, counsel's "ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A petitioner cannot show prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

In evaluating whether the petitioner has satisfied the two-pronged test set forth in *Strickland*, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991–92 (4th Cir. 2015) (citing *Strickland*, 466 U.S. at 697). Because failing either prong is fatal to a petitioner's claim, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

When a § 2254 petitioner challenges a state court's disposition of ineffective assistance of counsel claims, "AEDPA and *Strickland* [] provide 'dual and overlapping' lenses of deference, which [courts] apply 'simultaneously rather than sequentially.'" *Crockett v. Clarke*, 35 F.4th 231, 242 (4th Cir. 2022) (quoting *Owens v. Stirling*, 967 F.3d 396, 411 (4th Cir. 2020)). This "double-deference standard" limits the Court's review "to a determination of whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* (quoting *Morva v. Zook*, 821 F.3d 517, 528 (4th Cir. 2016)) (internal quotation marks omitted); *see also Harrington*, 562 U.S. at 101–02.

### 1. Ground Four

In ground four, Hamel claims that his trial counsel was ineffective because she improperly advised him that the state could bring up his criminal record if he testified in his own defense. He alleges that "[t]rial counsel told the defendant the entire time that he would not be testifying because of his past criminal record." ECF 3, at 17. He states that she improperly advised him that

his criminal record would be used against him, even though the state's attorney stated on the record

that "the State was even unsure if the defendant had impeachable offenses." *Id.*

Hamel raised this claim in his post-conviction petition. The circuit court rejected this claim

because the trial transcript directly contradicted Hamel's contention that he was unaware that no

impeachable crimes would be used against him if he chose to testify. ECF 19-2, at 42–44. The

court cited the relevant portions of the trial transcript:

> [Defense Counsel:] Mr. Hamel, you have the absolute right to take the stand in your
> own defense. If you elect to take the stand in your own defense, if you have
> anything what's called an impeachable offense, you may be asked about them . . . .
> So I would ask Madam State's Attorney to tell you the crimes for which she would
> be able to impeach you.

> [Prosecutor:] Your Honor, with respect to Mr. Hamel's record, there are to the
> State's reading of his record no such crimes. There is a firearm/drug trafficking
> from November 2005. There is no indication on the information that I possess in
> front of me at this moment as to whether or not he was convicted of distribution
> and so the State has no impeachable standards.

> [Defense Counsel:] So, Mr. Hamel, you've heard the fact of Madam—

> THE COURT: I'm sorry to interrupt. But do you think that manslaughter is too
> old? I have on the sheet a 1998—

> [Prosecutor:] There is a 1998 manslaughter, Your Honor, that is—Your Honor,
> with respect to my reading, I was not certain and I was waiting—am still waiting
> for confirmation as to the manslaughter charge. I do not believe that that can be
> utilized as impeachable.

> THE COURT: All right. If the State wouldn't intend to use it, then that would
> answer the question.

> [Defense Counsel:] Your Honor, I believe the State's reliance on the fact that it's
> involuntary manslaughter and therefore that's why it wouldn't be impeachable.

> THE COURT: All right . . .

[Defense Counsel:] So, at this point Mr. Hamel you're aware the state has no impeachable offenses for which they could go forward. Is it your election to take the stand or remain silent?

Hamel: Remain Silent.

ECF 23-6, at 89–91. The court found that Hamel had "failed to produce any evidence to support" his position that trial counsel had advised him that his previous conviction could be used to impeach his testimony. ECF 19-2, at 43–44. It noted that trial counsel had in fact assured Hamel on the record that his previous conviction for involuntary manslaughter could not be used for impeachment. *Id.* at 44. It concluded that the "record reflects that Petitioner was informed of both his right to testify and his right to take the stand in his own defense" and that he "responded, affirmatively, that he wanted to remain silent." *Id*.

Hamel has not established that the post-conviction court's ruling was contrary to or an unreasonable application of *Strickland* or any other federal law. The court cited and referred to *Strickland*, and its application of the ineffective assistance standard does not constitute an error beyond the possibility of fair-minded disagreement. Rather, the court examined the record to determine whether trial counsel's performance was deficient and concluded that Hamel's allegations were unsupported and contradicted by the relevant portions of the trial transcript. Hamel has not provided clear and convincing evidence to rebut the court's finding that trial counsel advised him of his right to take the stand and testify in his own defense and informed him that his prior convictions could not be used to impeach his credibility. Based on that finding, the post-conviction court correctly determined that trial counsel's performance was not constitutionally deficient.

Hamel's fourth claim is without merit.

### 2.   Ground Five

In ground five, Hamel contends that trial counsel's improper advice about testifying in his own defense prevented him from establishing a successful defense of involuntary manslaughter based on hot blooded response to legally adequate provocation.   The reasoning underlying this claim relates to grounds three and four.   Hamel claims that trial counsel erroneously advised him about his right to take the stand (as alleged in ground four); that he did not take the stand based on trial counsel's advice; and that, as a result, the trial court refused to instruct the jury regarding involuntary manslaughter because there was insufficient evidence to support that defense (as alleged in ground three).   The Court views ground five as (1) an elaboration of how Hamel was allegedly prejudiced by the ineffective assistance he asserts in ground four, and (2) a claim that counsel was ineffective for not pursuing the defense of involuntary manslaughter and not advising Hamel to testify in support of that defense.

Hamel raised these claims in his post-conviction petition.   The post-conviction court concluded that trial counsel reasonably and strategically pursued a theory of misidentification at trial based on inconsistent witness testimony.   It noted that Hamel testified at the post-conviction hearing "that he never spoke about trial strategy with Trial Counsel, other than indicating that he was not the shooter."   ECF 19-2, at 44; *see* ECF 23-10, at 16 (Hamel's post-conviction testimony).   The court found that it would have been unreasonable for trial counsel to submit a theory of complete innocence to the jury and then have Hamel testify that he shot the victim in an enraged state.   ECF 19-2, at 54.   And, as explained above, the court determined that trial counsel adequately advised Hamel of his right to testify.

Hamel's elaboration on how the failure he alleges in ground four prejudiced him concerns the second prong of *Strickland*.   Thus, it does not bear on the Court's earlier conclusion that the

post-conviction court did not misapply *Strickland* in ruling that trial counsel's performance was not constitutionally deficient under the first prong.

Hamel has not established that the post-conviction court's conclusion that trial counsel reasonably pursued a strategy of innocence based on misidentification was contrary to or an unreasonable application of *Strickland*.  Hamel argues that a "theory of misidentification based on inconsistent witness testimony would not be logical" because he told trial counsel "that he was at the [scene] so witnesses would have obviously seen" him there.  ECF 3, at 20.  But the fact that Hamel informed his counsel that he was at the scene is not inconsistent with the theory that witnesses at the scene misidentified Hamel as the shooter.  And Hamel does not provide clear and convincing evidence to undermine the post-conviction court's finding that he advised trial counsel that he was not the shooter—the principal basis for trial counsel's strategy.  That finding is supported by Hamel's testimony at the post-conviction hearing.  ECF 23-10, at 16.  Ultimately, the record supports the conclusion that Hamel's trial counsel reasonably chose to pursue a defense theory that was consistent with the information she received from her client.  Such strategic decisions are "virtually unchallengeable."  *Strickland*, 466 U.S. at 691; *see also Jackson v. Shanks*, 143 F.3d 1313, 1326 (10th Cir. 1998) ("Trial counsel's decision not to present inconsistent defense theories does not constitute ineffective assistance").

Hamel's fifth claim is without merit.

### 3.  Ground Six

In ground six, Hamel contends that his trial counsel was ineffective for failing to call eight fact witnesses at trial: Peter Bendermanis, Michael McCabe, Heather McCabe, Michael Crim, Kimberly Perkins, Bob Riley, J.R. Wallace, and Vattel Rose.  ECF 3, at 21–24.

As an initial matter, Hamel concedes that the claim that Rose should have been called to testify was not raised before the post-conviction court and is procedurally defaulted.  ECF 19, at 43; ECF 3, at 23.  Hamel faults his post-conviction counsel for failing to include Rose in his post-conviction petition.  ECF 3, at 24.  "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  As the Supreme Court has explained, "[w]hen an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claims" of ineffective trial counsel; thus, initial-review collateral proceedings are "in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim." *Id.* at 10–11.  However, the Supreme Court recently held in *Shinn v. Ramirez*, --- U.S. ----, 142 S. Ct. 1718 (2022), that "a state prisoner is responsible for counsel's negligent failure to develop the state post-conviction record." *Id.* at 1735.  In effect, federal district courts reviewing state habeas petitions may not consider any evidence that was not included in the state court record unless the petitioner can satisfy the stringent requirements of 28 U.S.C. § 2254(e)(2), even if the petitioner's post-conviction counsel was ineffective for failing to raise the claim and develop the evidence.  *Id.* at 1735.  Thus, the Court is limited to the testimony in the state court record and cannot consider Hamel's allegations about what trial testimony Rose might have given if called to testify.[5]  Absent any evidence, even if Hamel could overcome the procedural default, the claim regarding Rose is without merit.

---

[5] Pursuant to *Ramirez* and 28 U.S.C. § 2254(e)(2), the Court cannot hold an evidentiary hearing to allow Hamel to develop the factual basis for his claim regarding Rose.  He has not shown that the evidence in question satisfies the stringent requirements of § 2254(e)(2)—that it could not previously have been discovered through the exercise of due diligence and that the evidence is such that no reasonable factfinder would have found him guilty after considering it.  To the contrary, he alleges that he made numerous requests to trial counsel to include Rose.

As to the exhausted portion of ground six, Hamel alleges that Bendermanis would have provided an alternative description of the shooter as a Black male (Hamel is white); Michael and Heather McCabe each would have testified that they did not select Hamel in a photo array; Crim and Perkins would have testified that they heard two bangs; Riley would have testified that he saw three black juveniles running from the scene; and Wallace would have testified that a black male in a black Corolla was the shooter.  ECF 3, at 21–23.  Hamel claims "[a]ll these witnesses would have painted a more complete picture of what happened" and "contributed to the already wide range of inconsistencies in the State's case."  *Id.* at 24.

Hamel raised these claims in his post-conviction petition.  The post-conviction court rejected them.  It closely analyzed Hamel's allegations as to what each witness would have said at trial.  ECF 19-2, at 44, 50–51.  It acknowledged precedent requiring "a heavy measure of deference" to trial counsel's strategic decisions to call or not call witnesses.  *Id.* at 45 (citing *State v. Borchard*, 914 A.2d 1126 (Md. 2007)); *see also United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010) (explaining that the "decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney"); *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (noting whether to call a defense witness is "a 'strategic decision' demanding the assessment and balancing of perceived benefits against perceived risks, and one to which '[w]e must afford . . . enormous deference'")) (citation omitted).  The court found that Hamel failed to show that the additional testimony would have changed the outcome of the trial.  *Id.* at 50–52.  It reasoned that the State's witnesses were at times inconsistent in their recollections, and it was not clear how additional inconsistent accounts of the incident would have mattered.  *Id.* at 52.  It concluded that trial counsel's strategic decision to "allow inconsistencies in state's case to speak for themselves" and her decisions as to which witnesses to call were reasonable and entitled to deference.  ECF 19-2,

at 44–46, 52–53.  It noted that trial counsel had demonstrated that she was aware of the array of potential witnesses, including an important missing witness, Jason Johnson, whose absence she chose to highlight for the jury.  *Id.* at 45.

Hamel has not established that the post-conviction court's analysis was improper under the deferential standard of review.  The court scrutinized the evidence, cited the appropriate law, and concluded that trial counsel's strategic choices were not deficient performance or prejudicial to Hamel.  While Hamel argues that the additional testimony would have provided a more complete picture and further illuminated inconsistencies in witness recollections, he does not offer evidence that his counsel did not thoroughly investigate the potential witnesses.  And the additional testimony he describes is not so compelling that trial counsel was unquestionably deficient for failing to pursue it.

Hamel's sixth claim is without merit.

### 4.  Ground Seven

In ground seven, Hamel contends that his trial counsel was ineffective for failing to hire a trajectory expert.  ECF 3, at 25–26.  Hamel points out that his trial counsel elicited testimony that the bullet entered the victim's left side and travelled in an upward direction, coming to rest in the victim's right arm.  *See* ECF 23-4, at 123.  Trial counsel argued to the jury that Hamel could not have fired the shot from outside of the vehicle, *see* ECF 23-6, at 162, but the State argued in rebuttal that the bullet path could be explained because the victim was leaning over when he was shot.  *Id.* at 168.  Hamel states that he "believes" that expert testimony, "had it been sought, would have undermined the State's theory that [he] could have caused the victims injury by firing a shot from outside the vehicle."  ECF 3, at 25.

Hamel raised this claim in his post-conviction petition.  *See* ECF 19-2, at 46.  The post-conviction court dismissed the claim, finding that trial counsel adequately cross-examined the medical examiner on the upward bullet trajectory.  *Id.* at 46–47.  It deemed counsel's strategic decision not to call its own expert witness to be sound, citing Supreme Court precedent noting that there are countless ways for a reasonable attorney to provide effective assistance.  *Id.* at 46 (citing *Harrington*, 562 U.S. 86).  It distinguished a case Hamel relied on, *Bowers v. State*, 320 Md. 416 (1990), on the grounds that the attorney in *Bowers* failed to challenge incompatible evidence and to examine a State's witness regarding another suspect.  While the attorney in that case was from a post-conviction unit and had no experience working on murder cases, the court noted that Hamel's counsel testified she has 28 years of public defense and trial attorney experience.

Hamel has not established that the post-conviction court misapplied federal law.  Counsel has wide latitude in making tactical decisions, which is rarely limited to any one technique or approach such as calling an expert.  *Moore v. Hardee*, 723 F.3d 488, 498 (4th Cir. 2013) (citing *Richter*, 562 U.S. at 106).  In *Moore*, the Fourth Circuit reversed a district court's judgment that granted petitioner's habeas claim that his trial counsel was constitutionally ineffective for failing to call an expert in the fallibility of eyewitness testimony.  *Id.* at 498–99.  It reasoned that trial counsel's "classic" strategy of cross-examining witnesses was reasonable and that the state court's wide latitude to determine when an expert is necessary were entitled to deference.  *Id.* at 497–98.  Here, the court's conclusion was supported by the record, which showed that trial counsel thoroughly cross-examined the medical examiner on bullet trajectory.

In addition, when a petitioner's ineffective assistance of counsel claim rests on trial counsel's failure to call a particular witness, expert or otherwise, the Fourth Circuit requires the petitioner to make "a specific proffer . . . as to what an expert witness would have testified."

*Vandross v. Stirling*, 986 F.3d 442, 452 (4th Cir. 2021) (internal citations omitted).  Failure to do so "reduces any claim of prejudice *to mere speculation* and is fatal to his claim."  *Id.* (internal citations omitted) (emphasis in *Vandross*).  Hamel offers only his belief that a trajectory expert would have rebutted the State's theory of the bullet trajectory.  His speculation does not provide a sound basis for federal relief.

Hamel's seventh claim is without merit.

### 5.  Ground Eight

In ground eight, Hamel contends that his counsel was ineffective for failing to respond to information that one of the jurors saw him in shackles.  Hamel alleges that one of the jurors saw him in restraints on the mornings of February 5 and February 6, 2013 as he was being transferred from the transport van to the courthouse.  ECF 3, at 27.  Hamel claims that he was denied a fair trial because his counsel failed to bring the issue to the court's attention, including by conducting a *voir dire* of the juror, requesting a curative jury instruction, or moving for a mistrial.  *See* ECF 19-2, at 15.

Hamel raised this claim in his post-conviction petition.  *See id.* at 47.  The post-conviction court noted that Hamel failed to ask trial counsel during the post-conviction hearing whether she was aware that he had been observed in shackles.  *Id.* at 48.  The only evidence that trial counsel was aware was Hamel's own testimony.  The court further noted that Hamel had waited nearly a month after his trial to bring the issue to the trial court's attention; he raised the issue in a letter to the trial court before sentencing, the court addressed it on the record, and Hamel stated at that time that he did not intend to make any motions requiring court action.  *Id.* at 47–48.  The court nevertheless concluded that Hamel had not established that what the juror saw was so inherently prejudicial as to pose an unacceptable threat to his right to a fair trial.  *Id.*  The court cited *Bruce*

*v. State*, in which the Court of Appeals held that a jury's inadvertent viewing of the defendant in handcuffs outside of trial "did not require the trial judge to take any action *sua sponte*, and did not result in any prejudice to defendant's right to a fair trial."  569 A.2d 1254, 1262 (Md. 1990) (discussing *Holbrook v. Flynn*, 475 U.S. 560, 572 (1986)).

Hamel has not established that the post-conviction court's conclusion was contrary to or an unreasonable application of federal law.  A juror's brief and inadvertent observation of the defendant in shackles being transported to the courthouse does not result in prejudice.  *United States v. Diamond*, 561 F.2d 557, 559 (4th Cir. 1977) (holding that district court was not required to declare mistrial because juror inadvertently saw one defendant in handcuffs during course of trial when neither defendant showed actual prejudice); *United States v. Jackson*, 423 F. App'x 329, 331 (4th Cir. 2011) (citing *United States v. Lattner*, 385 F.3d 947, 959–60 (6th Cir. 2004); *United States v. Halliburton*, 870 F.2d 557, 560–61 (9th Cir. 1989)).  As the post-conviction court noted, Hamel was shackled during transportation, not during the trial itself.  ECF 19-2, at 49.  Moreover, he has not clearly established that trial counsel was aware of the issue during the trial.  The post-conviction court concluded, consistent with Supreme Court precedent, that because Hamel could not demonstrate prejudice, he failed to establish that trial counsel rendered ineffective assistance. *Id.*  This was a reasonable application of *Strickland*.

Hamel's eighth claim is without merit.

### 6.  Ground Nine

Finally, in ground nine, Hamel contends that his trial counsel was ineffective for failing to object when the prosecutor argued facts not in evidence during closing argument.  Hamel takes issue with the following argument by the prosecutor:

> And Crystal [Staggs] tells you Jason comes in, that David comes in, and they're both apologizing to her.  They're both upset.  I'm so sorry.  We didn't mean to get

> you involved.  But there's your car in the middle of that crime scene.  We're so
> sorry.  And then Jason explains it, and he shows her the bag, and he says this is
> what they gave me.  We had to shoot them.  We had to shoot them because I'm not
> getting played.  Nobody plays Jason Hamel for a fool.

ECF 3, at 28 (referring to ECF 23-6, at 147–48).  He claims that Staggs "said nothing of the sort"

and "absolutely did not say that Jason Hamel shot anyone."  ECF 3, at 28.  He also claims that the

statement included hearsay about the ultimate issue in the case.  *Id.*

Hamel raised this claim in his post-conviction petition.  The post-conviction court

determined that the prosecutor's closing argument was not improper.  ECF 19-2, at 55–56.  It

found that "almost the entirety of the remarks were from Ms. Staggs' testimony."  *Id.* at 55.  It

pointed to specific portions of Staggs' testimony in the trial transcript.  *Id.* at 55–56 (referring to

ECF 23-6, at 12–30).[6]  While the prosecutor did not use direct quotes, the statements were not

offered as direct quotes, and they were reasonable arguments based on Staggs' testimony.  *Id.*  The

court found that the only statement not part of Staggs' testimony, "nobody plays Jason Hamel for

a fool," was an argument of the State's theory of the case and was reasonable based on Staggs'

testimony.  *Id.* at 56.  The court alternatively concluded that trial counsel's decision not to object

during closing argument was strategic and within the wide range of competent representation

consistent with the Sixth Amendment.  *Id.* (citing *Oken v. State*, 681 A.2d 30 (Md. 1996)).

---

[6] Staggs testified that she saw Hamel the night of the shooting.  He was nervous and pacing and
he said to her, "I'm sorry.  I didn't want to get you involved."  ECF 23-6, at 16–17.  Staggs also
testified that she had a conversation with her boyfriend, David Bennett, who told her that he took
her car because he and Hamel "had to go run somewhere."  *Id.* at 17.  She recalled hearing that
"[s]omething had happened, went down . . . he had mentioned it was like a drug deal gone bad."
*Id.* at 17–18.  She saw a bag with a white shirt in it, and "Dave was saying how I guess they went
to go get something . . . the boys that they went to go meet had given Jason and Dave a shirt in a
bad instead of whatever they had went to get."  *Id.* at 18.  Staggs testified on direct examination
that she did not remember Hamel or Bennett ever saying that they shot anyone.  *Id.* at 27.  On cross
examination, she testified that she told the police that "they both had to shoot whoever."  *Id.* at 35.

Hamel has not established that the post-conviction court's analysis of his ninth claim is contrary to or an unreasonable application of federal law.  He does not explain how the court's application of *Strickland* and Maryland precedent is inconsistent with the Constitution's requirements.  To the contrary, the Fourth Circuit has recognized that "[c]losing argument is not merely a time for recitation of uncontroverted facts, but rather the prosecution may make fair inferences from the evidence."  *United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1994).  As noted by the circuit court, Staggs' trial testimony supports the prosecutor's statements either directly or as a basis for reasonable argument in light of other evidence.  Additionally, "refraining from objecting in order to avoid irritating the jury is a standard trial tactic."  *See Bennett v. Angelone*, 92 F.3d 1336, 1349 (4th Cir. 1996).  The post-conviction court's conclusion that trial counsel's strategic decision not to object to reasonable argument was not deficient performance was not contrary to or an unreasonable application of federal law.

Hamel's ninth claim is without merit.

## IV.   Certificate of Appealability

The accompanying Order is a final order adverse to Hamel.  Thus, the Court must issue or deny a certificate of appealability.  Rule 11(a), *Rules Governing Section 2255 Cases in the U.S. Dist. Cts.*  Hamel must receive a certificate of appealability before an appeal may proceed.  28 U.S.C. § 2253(c)(1).

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a district court rejects a habeas petition on the merits, as here, a petitioner may satisfy this standard only by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Hamel

has failed to demonstrate that a certificate of appealability should issue.  He still may request that the United States Court of Appeals for the Fourth Circuit issue such a certificate.  *See* Fed. R. App. P. 22(b).

**V.       Conclusion**

The motion to seal, ECF 24, is granted.  Hamel's habeas petition, ECF 1, is denied.  The Court declines to issue a certificate of appealability.  A separate order follows.


4/6/2023                                                              _____
Date                                                                    Deborah L. Boardman
                                                                            United States District Judge